1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8
   PAIGE A. NORBY, dba TUCSON          )
9  RANGE RIDERS, et al.,               )
                                       )
10           Plaintiffs,               )        No. CIV 07-232-TUC-CKJ
                                       )
11  vs.                                )              **ORDER**
                                       )
12  CITY OF TOMBSTONE, et al.,         )
                                       )
13           Defendants.               )
   _____)

14

15         Pending before the Court are Defendants' Motion for Summary Judgment (Docs. 190,

16  196, 228) and Plaintiffs' Objection and Motion to Strike and Motion to Reconsider Sur-

17  Reply (Docs. 252 and 253).  The parties presented oral argument to the Court on March 18,

    2011.  Additionally, Plaintiffs' Second Joint Objection to Defendants' Amended Summary
18
    Response and Motion to Strike and Motion to Reconsider Sur-Reply is pending before the
19
    Court (Doc. 258).
20

21  *Factual Background*

22         An action has been filed by David Weik ("Weik") and Paige Norby Weik ("Weik")

23  (collectively, "Plaintiffs") against Defendants City of Tombstone, Marshall Merlin Jay Smith

24  ("Smith"), Councilwoman Stacey Korbeck-Reeder ("Korbeck-Reeder") and Stephen Schmidt

25  ("Schmidt").[1]

26

27  _____

          [1]Schmidt was a City Councilman during the relevant time period.  Additionally,
28  claims were also made against Dustin Escapule, Sr.  Those claims were dismissed on May

*Tombstone Rangeworks General Store and Tombstone Range Riders*

Plaintiffs operated Tombstone Rangeworks General Store and Tombstone Range Riders, a trail riding business, at 116 S. Fourth Street in Tombstone, Arizona. Weik initially obtained a business permit for the store on May 27, 2005. The store operated until August of 2006.

On December 6, 2005, Weik expressed his desire to the Tombstone City Council ("City Council") to conduct horse trail rides within the City of Tombstone and suggested staging them on Allen Street. On December 7, 2005, Weik submitted three animal use permit applications for four horses each to conduct a trail riding business within the town limits.

On December 20, 2005, during the next City Council meeting, some people present expressed safety concerns over allowing single horse trail rides on downtown Allen Street.[2] At that meeting, the City Council members discussed with Weik other concerns including sanitation issues, insurance, damage to roads, staging location, and other organizations using Allen Street. Two members of the City Council voted to approve the permit applications and two members voted against approval.

On January 5, 2006, the City Council again addressed the issue. Defendants assert this is because Plaintiffs requested a 60 day conditional permit. Plaintiffs assert that the 60-day permit was proposed by the City Council. The City Council voted to approve a permit for nine horses, with a staging location of 116 S. 4th Street.[3] This conditional permit was

21, 2008.

[2]The parties dispute whether all persons expressing concerns were Tombstone residents. The basis of some of the concerns involved a previous incident where an individual was trampled by a trail horse owned by Blue Sky Ranches.

[3]Although Weik had informed the City Council that he owned the horses, Defendants assert that the horses were not purchased until after the permit was issued. Plaintiffs point out that the permit allowed for Plaintiffs to conduct trail rides for up to nine riders at a time, but did not limit Plaintiffs' ownership or possession to nine horses. The horses were kept within the city limits in a corral or stable area approximately a five to ten minute walk from the store front.

later extended.  The expiration date of the permit was January 27, 2007.  Norby's name was added to the permit on July 28, 2006.

Defendants assert Plaintiffs knew the City had not permitted them to stage on Allen Street when the permit was issued.[4]  During argument, Weik acknowledged that Plaintiffs knew they were not permitted to stage on Allen Street.

Weik requested a safer staging location from the City Council.[5]  At the February 14, 2006, meeting the request died for lack of motion.

Plaintiffs requested permission from Mayor Andree DeJournett ("DeJournett") to place a covered wagon in front of the store  at 116 S. Fourth Street in Tombstone, Arizona – in front of the gas meter and above the ground gas line; DeJournett granted the request. Weik went before the City Council on January 17, 2006, and was told to move the wagon because its placement had not been approved by the City Council.[6]

Defendants assert that, due to safety issues regarding traffic and the gas line, Plaintiffs began staging across the street in a parking lot area.  Defendants also assert that Plaintiffs had not received permission from the parking lot owner to do this; the owners of the parking lot told Plaintiffs to move the horses.  Plaintiffs assert that they staged some rides from a vacant lot near the store.  Plaintiffs also staged some rides from the corral.

On September 19, 2006, Weik asked the City Council if he could stage his horses on Allen Street.  Safety issues regarding traffic and a gas meter were discussed.  The City

---

[4]Defendants assert Allen Street is the main tourist attraction in Tombstone which has over 400,000 visitors each year.  Plaintiffs assert there is nothing to support Defendants' claim. Other groups, including the Tombstone Vigilantes, the Tombstone Office of Tourism, Tombstone Chamber of Commerce, Tucson Tumbleweed, Tombstone Western Music Festival, and the Tombstone Lions Club, use Allen Street for various activities, but their activities do not involve a horse trail riding business.

[5]Plaintiffs point out that, while Allen Street does not have any vehicular traffic, 4th Street not only has vehicular traffic, but a gas meter was located in front of the Tombstone Rangeworks General Store.

[6]Plaintiffs point out that the Historic District Commission recommended to the City Council that the placement of the covered wagon be approved.

1  Council denied the request.

2       Defendants assert that Smith discussed the proposed staging area with business

3  owners on Allen Street.  The business owners objected to the proposed staging area.  Smith

4  recommended against the proposed staging in a confidential memorandum to the City

5  Council.  Smith subsequently attempted to speak with Weik about another possible staging

6  area; Weik refused to talk with Smith.

7       The renewal of Tombstone Range Rider's Animal Use Permit was placed on the

8  agenda for the December 12, 2006, City Council meeting.  The renewal died for lack of a

9  motion.  DSOF, Ex. 10.

10      City Clerk George Burns sent a letter to Weik on December 18, 2007, informing Weik

11 that additional information regarding permits needed to be provided by January 5, 2007.

12 Weik provided some of the requested information on January 8, 2007.

13      On January 9, 2007, Weik went before the City Council regarding the permit renewal.

14 Weik claimed that the staging area was up in the air, but that he was just seeking renewal of

15 the permit at that time; Weik did not inform the City Council that he was willing to stage

16 from his corral area.  The minutes indicate that the City Council and Weik discussed zoning

17 issues and Weik's complaints regarding the safety of staging areas. Weik informed the City

18 Council that he would obtain insurance only if his permit was renewed.  The City Council

19 requested Weik return when he had a complete package and had a place to stage the horses.

20 The minutes from that Council meeting state:

21      City Attorney Mr. Bays advised the City Council:

22      [I]n essence because we are still in the discussion phase, the City is only being asked
        to approve a permit for being able to ride the horses within the city limits.  If the
23      entity is violating a zoning ordinance then there are other avenues that we can get that
        enforced.  It is not something we have to necessarily decide tonight on whether or not
24      we are going to approve or disapprove the permit that he is requesting.  Furthermore,
        in order to disapprove the permit that is already in use right now, I realize that it is
25      only a one (1) year permit, but the City is going to have to have a good faith basis for
        disapproving a business permit that they previously have already approved. The good
26      faith basis could be the health, safety and welfare of the citizens of Tombstone or
        tourist, but not necessarily because he is violating a zoning ordinance that can be
27      enforced through some other action.

28 DSOF, Ex. 11, p. 5.  No member of the City Council moved to approve the Animal Use

- 4 -

1   Permit renewal for Tombstone Range Riders for the operation of trail rides and the request
2   died for lack of a motion.

3        Defendants assert that the City Attorney has indicated that additional information
4   (including home addresses, proof of insurance, staging area, names and information
5   regarding wranglers, Weik's driver's license number, and $100 deposit per animal) was not
6   provided to the City Council.  DSOF, Ex. 27.  However, the minutes of the January 9, 2007,
7   City Council meeting indicate that City Clerk George Burns stated that "Mr. Weik has
8   provided the information that we requested such as driver's license, certifications, the owners
9   of the businesses, and will provide a copy of the certificate of insurance upon approval
10  because it is not refundable."  DSOF, Ex. 11, p. 2.  Defendants point out that Weik never
11  had a valid driver's license during this time although it is a requirement of the permit.

12       Weik did not return to the City Council with a proposed staging area and did not
13  address questions from the City Attorney regarding the permit application.

14       Plaintiffs' insurance expired on January 20, 2007.  Pursuant to the City Code, the
15  permit was immediately deemed cancelled when the insurance expired.

16       Plaintiffs asserts that the City of Tombstone never sent Plaintiffs a Letter of Denial.[7]

17       The trail ride business was dissolved on January 24, 2007.  No citation for any
18  violation of safety or city codes was ever issued to Weik, Norby, the Tombstone Range Rider
19  business, or the Tombstone Range Rider wranglers.

20

21  *Contacts Between Smith and Weik*

22       *Reports from Kitchel and Fike*

23       Defendants assert that, on May 16, 2006, Harvey Kitchel ("Kitchel") contacted the

24

25

26  _____

27       [7]Plaintiffs point to the deposition of Brenda Ikirt in which she indicates that the City
     Council was required to send a denial letter of application. PSSOF, Ex. 47 (Doc. 222-4), p.
28   139.

1   Marshal's office and Smith began conducting a fraud investigation regarding Weik.[8]

2   Although Plaintiffs point out that Smith, during his deposition, did not provide a date when

3   Kitchel contacted him, Smith's incident report indicates that Kitchel contacted Smith on May

4   16, 2006. *See* DSOF, Ex. 20.

5       Defendants assert that Mike Fike ("Fike"), one of Plaintiffs' customers, stated that

6   Weik had threatened him on May 19, 2006. Plaintiffs point out that, in the letter Fike sent

7   to the Tombstone Chamber of Commerce, Fike did not state that Weik threatened him.

8       Smith investigated the incident. At one point, Smith contacted Weik at the Tombstone

9   Range Works and General Store. According to Smith's incident report, Weik permitted

10  Smith to review the rental agreement between Tucson Range Riders and Fike. Plaintiffs

11  assert that Smith told Weik he was going to take the Fike liability waivers and see about

12  getting Plaintiffs' permit pulled. Defendants assert that, when Smith told Weik that it would

13  be in everyone's best interest for Weik to return Fike's rental fee, Weik stated that he would

14  talk with his attorney first and left the store. Smith took possession of the waivers;

15  Defendants assert this was done without objection from Norby.

16      Smith's incident report indicates that Weik returned shortly and indicated that his

17  attorney agreed that it would probably be best to refund the money. *See* DSOF, Ex. 20.

18  Plaintiffs assert the attorney returned with Weik and the attorney spoke with Smith.

19  Plaintiffs assert Weik discovered that Smith had taken the waivers without authorization.

20  Weik's attorney arranged for the return of the waivers from Smith. PSSOF, Ex. 76, p. 238.

21  During his deposition, Smith stated that he took the waivers without asking permission.

22

23  ────────────

24      [8]The relationship between Weik and Norby ended at the end of May 2006.
    Defendants assert that Norby had hired Kitchel to investigate Weik after she learned that he
25  was still married and that Norby had given money to Weik on a promise that they would be
    married. Plaintiffs assert that Weik's ex-wife did not inform Weik that there had been a
26  problem with the divorce proceedings and Weik did complete divorce proceedings. Plaintiffs
    further assert that Norby did not give money to Weik on a promise of marriage. The parties
27  dispute whether Norby ever stated that she was afraid of Weik. Norby and Weik
    subsequently reconciled and were married.
28

PSSOF, Ex. 76, p. 236-37.

Smith referred the Fike matter to the prosecutor on June 6, 2006.  Although Weik was formally charged, the charges were dismissed on February 2, 2007.  PSSOF, Exs. 90-91.

*Hitching Rail Incident*

On May 24, 2006, Weik, in western wear, was standing at the hitching rail on 4th Street and Allen Street.  Weik asserts that Smith pushed Weik against a rail and tried to pull out Weik's gun.  Weik further asserts that, when Weik turned around, Smith said, "No one is watching your back," and walked away. Witness Randy Tamplin ("Tamplin") testified at deposition that Smith put a hand or fist on Weik's back and grabbed Weik's gun.  PSSOF, Ex. 83, p. 48.  Mike Jones ("Jones") testified during his deposition that Smith shoved Weik on the shoulder and tried to pull his gun and that it did not seem like Smith was merely horsing around; he also testified that Weik had "smirked like what a jerk.  What an idiot." PSSOF, Ex. 81, pp. 33, 60-61.  In a June 14, 2006, memorandum to the Tombstone Mayor and City Council, Smith stated that he "did in fact walk up behind Mr. Weik and put [his] hand on the butt of one of [Weik's] guns and shook it.  At the same time [Smith] put a finger in the small of [Weik's] back and said 'who's watching your back David?'  [Smith] made no attempt what so ever to remove his gun nor would I have any reason to do so.  [Smith's] conduct and comments were made entirely in jest and [Smith was] quite certain that Mr. Weik knew that at the time." DSOF, Ex. 22.  Weik asserts that he reported this incident to the mayor on May 24, 2006, and asserts that he reported the incident to the Arizona Department of Public Safety ("DPS") prior to June 5, 2006.  PSSOF, Ex. 87.  Defendants assert Weik did not report the incident to DPS until June 8, 2006, after Weik learned that Smith was investigating him.  The incident was investigated by the Arizona Department of Public Safety, which concluded that the claim was unfounded and closed its investigation.

*Care of Horses*

Additionally, on January 16, 2007, Weik's horses were investigated after a citizen

complained to the Marshal's office that the horses were not being fed and watered. The animal control officer and the fire chief fed and watered the horses and referred the matter to the Arizona Livestock Inspector. On January 20, 2007, Livestock Inspector Cathe Shelton visited the horses. Plaintiffs assert that she informed Weik that there were the best kept trail riding horses she had seen in years. Shelton issued findings to the Livestock and Agricultural Department and closed the file.

*City Council Aspirations of Weik*

Plaintiffs have presented evidence that Weik expressed interest in running for City Council. PSSOF, Ex. 2 pp. 69-70. Plaintiffs assert that Dwayne Harris intended to run for another City Council position with Weik. DeJournett stated in an affidavit that Weik told him many times that Weik wanted to run for City Council. When asked by the Court during argument what evidence existed that any of the Defendants knew of Weik's aspirations, Weik indicated that Tombstone is a small town and things get around by word of mouth. However, no evidence is before the Court that disputes the deposition testimony of Tamplin and Jones that they were not aware Weik was interested in running for City Council.

*Procedural History*

Plaintiffs filed a Complaint on May 21, 2007. The Complaint was dismissed with leave to amend and, on March 21, 2008, an Amended Complaint was filed. The Amended Complaint alleged claims of defamation, harassment, false light invasion of privacy, malicious prosecution, abuse of process, assault, respondeat superior, and conspiracy. The Amended Complaint also alleged violations of the First Amendment, Fourth Amendment, Fifth Amendment, and the Fourteenth Amendment. The assault claim and the Fourth Amendment claim as to Plaintiffs' papers and effects were alleged against Smith alone.[9] The

---

[9]The Amended Complaint refers to the "Defendant's papers and effects[.]" Doc. 22, p. 13. Reading the statement in the context of the Amended Complaint, the Court accepts

1  remaining claims were alleged against all Defendants.

2        Following the filing of a previous Motion for Partial Summary Judgment, summary

3  judgment was granted in favor of Defendants as to the state law claims and judgment on the

4  pleadings was granted in favor of Defendants Korbeck-Reeder and Schmidt as to the First

5  Amendment retaliation claim, in favor of Smith as to the First Amendment association claim,

6  in favor of Korbeck-Reeder and Schmidt as to the Fourth Amendment claim, in favor of

7  Smith as to the Fifth Amendment takings claim, and in favor of Smith as to the Fourteenth

8  Amendment due process claim.  The claims that remain pending before the Court are a First

9  Amendment retaliation claim against Smith, a First Amendment expressive association claim

10  against Korbeck-Reeder and Schmidt, a Fourth Amendment claim against Smith, a Fifth

11  Amendment takings claim against Korbeck-Reeder and Schmidt, a Fourteenth Amendment

12  Due Process and Equal Protection claims against the City of Tombstone, Korbeck-Reeder,

13  and Schmidt, and a 42 U.S.C. § 1983 conspiracy claim against Smith, Korbeck-Reeder, and

14  Schmidt.  Additionally, policy-making claims against the City of Tombstone for the pending

15  claims against the individuals Defendants remain pending.

16        On March 30, 2010, Defendants filed a Motion for Summary Judgment (Docs. 190,

17  196, 228).  A Response and a Reply were filed.  On December 23, 2010, this Court granted

18  permission for Plaintiffs to file an Amended Response.  In issuing the Order, the Court made

19  clear that the Amended Response superseded the original response and that the original

20  response would not be considered in resolution of the Motion for Summary Judgment.  An

21  Amended Response (Docs. 244, 245, 221-225) and an Amended Reply (Doc. 249) have been

22  filed.

23        Plaintiffs have filed a controverting statement (Doc. 220).

24        Plaintiffs have filed an Objection and Motion to Strike and Motion to Reconsider Sur-

25  Reply (Docs. 252 and 253).  A Response and a Reply have been filed.  Plaintiffs also filed

26  a Second Joint Objection to Defendants' Amended Summary Response and Motion to Strike

27  _____

28  this statement to mean the Plaintiffs' papers and effects.

1   and Motion to Reconsider Sur-Reply (Doc. 258).

2

3   *Applicable City Code Provisions*

4        The Tombstone City Code sets out the requirements for an animal use permit.  Among

5   other provisions, the City Code gives the City Council discretion in issuing permits and to

6   consider the health and welfare of citizens, number of animal drawn vehicles on the streets,

7   the probable effect of increased service on local traffic, the character and experience of the

8   applicant, etc.:

9       A. Animal Use Permit Required:

10          1. In addition to the business license required pursuant to title 4 of this code,
    shall require each owner, peddler, merchant, itinerant merchant, solicitor or
11  proprietor, or any agent, assign, or subdivision of any kind, to obtain from the
    city clerk an animal use permit, hereinafter referred to as "permit", to be used
12  solely for the operation of commercial enterprises or businesses using animals
    or animal drawn vehicles on public streets within the limits of the city of
13  Tombstone. Permit holders shall not be granted a permit unless the permit
    holder has acknowledged in writing that this ordinance has been read in its
14  entirety and that, by being granted a permit under this ordinance, the permit
    holder consents to the rules, regulations, restrictions, and penalties embodied
15  in this ordinance and the laws of the state of Arizona and the city of
    Tombstone.
16
    2. It shall be unlawful for any person, enterprise or business, hereinafter
17  referred to as "person", to be licensed under title 4 of this code or permitted
    under this title to operate an animal or animal drawn vehicle (also known as
18  a wagon) on the streets of the city of Tombstone for commercial purposes;
    provided, however, the city clerk may issue licenses and permits for said
19  activities subject to the terms and conditions of this ordinance and such other
    reasonable terms or conditions as the mayor and common council may impose.
20  The mayor and common council have authority to promulgate rules and
    regulations relating to such licenses and permits in addition to those contained
21  herein.

22  B. Principal Also Liable: Any person, firm, partnership, corporation, or entity, or any
    officer or director thereof, employing any employees, shall also be liable for the
23  violation of any provision of this ordinance by its employee.

24  C. Indemnity: The holder of any permit issued under the terms of this ordinance shall
    release and indemnify, defend and save harmless the city, it officers, agents and
25  employees from and against any and all claims, actions, causes of action, demands,
    judgments, costs, expenses, and all damages of any kind and nature incurred by or
26  insuring to any person whatsoever predicated upon injury to death or any person to
    damage to property, public or private, or whatever ownership, or damage to business,
27  provided such injury, death, loss or damage shall arise out of or be connected directly
    or indirectly with the exercise of any right or privilege granted by such a permit.

28

- 10 -

D. Insurance Requirements:

1. No permit shall be issued or remain in effect unless the permittee, at the permittee's expenses and without cost to the city, procures, and maintain in force and on file with the city clerk sufficient evidence of a general liability policy naming the city of Tombstone as an additional insured covering bodily injury, including death, in the amount of one million dollars ($1,000,000.00) and one hundred thousand dollars ($100,000.00) coverage for injury to or destruction of property of others in any one accident.

2. Such insurance coverage constitutes a minimum requirement and shall in no way be deemed to limit or lessen the ability of the permittee under the terms of such permit. Permittee is encouraged to purchase additional coverage if at no cost to the city.

3. An endorsement shall be included on the required policy, providing for thirty (30) days' notice to the city of any material change or cancellation.

E. Designated Hours And Locations Of Operation:

1. The mayor and common council hereby promulgate rules and regulations designating the hours of operation and the acceptable areas, sites and streets in which animals and animal drawn vehicles may be ridden or operated for commercial purposes. The mayor and common council, or its designee may limit the number of animals and animal drawn vehicles in any area or within the limits of the city of Tombstone if such limitations are needed for the health, safety or welfare of the general public. Limitations shall be temporary and only for the period determined to address an immediate issue of health, safety or welfare. Limitations shall not be made unless reasonable and timely notice is given to the owner or operator specifying the reason for the temporary limitation. The term "operator" is intended to include persons driving, riding, or controlling animals.

2. It shall be unlawful for any person to operate an animal or animal drawn vehicle for commercial purposes at times or locations other than those permitted and stated on the permit.

3. The city clerk is authorized to issue periodic special use permits to peddlers, vendors and persons, waiving the normal hours and defined areas of operation when special days or events are being celebrated.

4. The hours of operation shall be from dawn to dusk.

5. The designated route(s) and loading/unloading zone(s) shall be mapped and filed with the office of the city clerk on the effective date of this ordinance and printed or attached to the permit.

F. Application: An application for a permit under these provisions shall be made to the city clerk and shall include the following information:

1. The name, address and telephone number, both business and personal of the applicant; in the case of an S corporation or closely held corporations, limited liability company or partnership, the names of the shareholders or owners, partners of officers with authority to act on behalf of the corporation or partnership.

2. The number of animals other than those connected to an animal drawn vehicle to be operated; not to exceed four (4) per permit holder.

3. A specific description of the area and the streets on which the animal drawn vehicle is to be operated; to include a description of city property and proposed ticket booths or structures.

4. Such other information as the city clerk may require; including the name of animal riders or animal drawn vehicle drivers, their ages and driver license numbers. After submission of initial application, the same information must be submitted for new drivers at the time the driver is hired. Permit holders shall be responsible for keeping the information contained on their application current.

G. Requirements For Issuance: A permit issued under this ordinance shall be subject to the following requirements:

1. The permit shall be valid for a period of not more than twelve (12) months after the date of issuance and may be revoked or suspended for cause. The expiration date of each permit shall be shown on the permit, and each permit shall expire at twelve o'clock (12:00) midnight on the expiration date. Any permit holder may renew a permit by submitting the same application with any updates or changes noted.

2. A permit issued under this ordinance is valid only for the applicant and is not transferable.

3. In addition to the permit holder's name and such other information required by the city clerk, the permit shall contain the following:

a. The period of time for which the permit is issued;

b. A statement that the permit issued is not transferable. In the case of a corporation, limited liability company or partnership, it shall be unlawful for the permit holder to transfer the permit to any person, shareholder, partner, owner or other entity not listed on the original application.

c. The locations and hours of the operation; and

d. A statement that the permit is subject to the provisions of this ordinance.

4. The permit holder shall designate by signing the permit that:

a. The permit holder is authorized to sign the permit;

b. The information contained in the application and permit are true and accurate to the best of the undersign's knowledge and belief;

c. This chapter has been read and understood in its entirety and that the permit holder consents and binds those operating under this permit to the rules, regulations, restrictions and penalties described herein.

H. Standards Of Issuance And Renewal:

1. If the city clerk finds upon application for a new permit that existing commercial animal drawn transportation for hire is adequate to meet the public convenience the permit application shall be taken by the city clerk to the mayor and common council for a final determination.

2. If the mayor and common council find that the particular commercial transportation for hire in the city will not place an undue burden on the health, safety, or welfare of its citizens and that additional commercial transportation will serve the public convenience and necessity and the applicant can satisfy the legal and financial obligations or responsibilities of this ordinance, and is willing and able to perform such public transportation and to conform to the provisions of this ordinance, then the city clerk shall be instructed to issue a permit to the applicant in accordance with the regulations and limitations stated in subsection I of this section.

3. The mayor and common council shall take into consideration the number of animal drawn vehicles already in operation, whether existing transportation is adequate to meet the public convenience, the probable effect of increased service on local traffic conditions, the character, experience and financial responsibility of the applicant, the number, kind and type of equipment being used in the enterprise.

4. No permit shall be issued by the city unless the applicant has certified in writing to the city clerk that each owner/operator has demonstrated his or her knowledge of horses or other such hoofed animals, animal drawn vehicles, and the handling of the combination of the animals and animal drawn vehicles.

I. Restrictions: A person or firm to whom a permit has been issued hereunder is subject to the following restrictions:

1. The rider or operator of an animal or animal drawn vehicle must be least eighteen (18) years of age and have a valid Arizona driver's license in order to ensure competency levels and knowledge of applicable transportation codes of the state of Arizona and must comply with the same when subject to this chapter.

2. No permit holder shall be allowed to operate more than four (4) animal drawn vehicles.

3. No person shall be allowed to have an interest in more than four (4) permits under this ordinance.

4. Permittee shall maintain premises and equipment in a clean and safe condition, and adhere to state laws and local regulations pertaining to the proper and humane treatment of animals. Maltreatment to, or neglect of the animals could result in civil or criminal penalties for offending parties.

5. Permittee shall immediately notify the city clerk of any change of address or substantial change in equipment or circumstances.

J. Fees: The fees for permits under this section, which apply to commercial use of animals and animal drawn vehicles, may be prorated if issued for less than one year shall be as follows:

- 13 -

1. Nonrefundable annual application fee: One hundred fifty dollars ($150.00);

2. Annual permit fee for loading area in the Tombstone historic district: Three hundred twenty dollars ($320.00) per vehicle or one hundred dollars ($100.00) per animal if no vehicle is involved; and

3. Special use permits for animals and animal drawn vehicles shall not exceed twenty dollars ($20.00) per vehicle or per animal without a vehicle, for each event. A special use permit shall be valid for a twenty four (24) hour period after its effective date or until the conclusion of the event for which the permit is issued, whichever comes first.

* * * * * *

L. Stopping And Loading Of Passengers: The mayor and common council shall establish, fund the construction of, and clearly designate stop and loading zones for animals and animal drawn vehicles. Only designated stop and loading zones will be used by the rider or operator for loading or unloading riders or passengers. No unauthorized zones will be permitted or condoned, except when emergencies arise or when the public safety, health and welfare are paramount considerations or when designated by a police officer.

* * * * *

Q. Waste Control: Efficient provisions should be made for the immediate and prompt removal of material deposited by animals. Failure to comply with this provision could result in suspension and/or revocation of the permit.

* * * * *

T. Operation/Contract Agreement: The mayor and common council are hereby authorized to place additional definitive restrictions on the permittee by a means of a written operation/contract agreement. The general types of considerations to be included in the said agreement are: route determination, roadway maintenance, loading and unloading sites; hours of operation; animal welfare, treatment and care; appearance and condition of a vehicle; vehicle modifications; expiration and amendment clauses; and authorized seating capacity per vehicle.

* * * * *

V. Suspension Or Revocation:

1. The violation of Arizona traffic regulations criminal code or city ordinances could result in suspension of operations up to thirty (30) days or permanent revocation by the mayor and common council.

2. A permit shall be immediately revoked if the permit holder or agents are found guilty of operating an animal or animal drawn vehicle under the influence of alcohol or an illegal drug. Operating a vehicle in a reckless manner could also be grounds for suspending or revoking a permit.

3. A permit shall be immediately revoked upon the cancellation of insurance as required by this ordinance.

4. The city clerk shall have the authority to suspend under this ordinance and

1
2
> recommend revocations to the mayor and common council. The office of city clerk and the office of city marshal are authorized to take any steps reasonably necessary to enforce this chapter.

3
> * * * * *

4   City Code 8-5-2.

5

6   *Plaintiffs' Joint Objection and Motion to Strike and Motion to Reconsider Sur-Reply*

7       Plaintiffs request the Court strike Defendants' Amended Reply and/or its Exhibit A.

8   Defendants' Exhibit A is a copy of portions of the Tombstone City Code.  The Court finds

9   this document is not evidence and it is not appropriate to strike a copy of the applicable

10  code.[10]  Further, the Court notes that the source of the document, Sterling Codifiers, is a

11  source used by the Court and the website, http://www.sterlingcodifiers.com/codebook/

12  index.php?book_id=541, indicates that the last update was based on May 8, 2007,

13  modifications.[11]

14      Plaintiffs also ask the Court to reconsider its previous Order denying Plaintiffs

15  permission to file a sur-reply regarding the summary judgment documents.  Plaintiffs assert

16  that they believe that the Court's Order was the result of Plaintiffs' failure to abide by the

17  Court's cut-off date for disclosure of discovery.  In issuing its Order, the Court stated:

18
19
20
> Additionally, the original Response having been superseded by the Amended Response, Defendants' Reply is null.  Defendants will be given an opportunity to file a new Reply.  Similarly, Plaintiffs' request to file a sur-reply is null; the Court will deny the request.

21  ─────────────────

22  [10]The Court declines to address Plaintiffs' objections regarding their opportunity to

23  respond based on "disclosure date" and mailing.  Exhibit A is, in essence, a legal authority rather than "evidence."  *See generally, Long Beach Area Peace Network v. City of Long*

24  *Beach*, 574 F.3d 1011, 1026 n.1 (9th Cir. 2009) (taking judicial notice of municipal ordinances).

25
26  [11]Plaintiffs' motion expresses concern that the Code presented to the Court includes revisions made after the filing of Plaintiffs' lawsuit.  The Court notes that this action was

27  filed on May 21, 2007, after the latest revisions.  Further, as discussed *infra*, the Court accepts that the portion specifically pointed out by Plaintiffs as having been modified in

28  2006, City Code § 1-6-10, was not in effect until November 21, 2006.

December 23, 2010, Order, p. 3.  Because Defendants' original Reply was null, there was no document that warranted a sur-reply at that time.  The Court will consider Plaintiffs' current request in light of the Amended Response and Amended Reply that have subsequently been filed.

Plaintiffs assert that Defendants make an argument based on new evidence in their Reply.  *See e.g. Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996), *cert denied* 522 U.S. 808 (1997) (party may not file "new" evidence with reply and then deprive opposing party opportunity to respond).  However, the "new evidence" complained of by Plaintiffs is a copy of portions of the City Code.  There has been no showing by Plaintiffs that they did not have access to this legal authority when preparing their Amended Response.[12]  The Court finds Plaintiffs have not shown any basis to either strike the reply or permit a sur-reply.  *See generally Macquarie Group Ltd. v. Pacific Corporate Group, LLC,* No. 08 CV 2113-IEG-WMC, 2009 WL 539928, at *3 (S.D.Cal.2009), *citing* 5C Wright & A. Miller, Federal Practice and Procedure § 1380 (3d ed. 2004) ("Motions to strike are a drastic remedy and generally disfavored."); L.R.Civ. 7.2 (providing for motion, response, and reply); *Silvas v. GMAC Mortg., LLC*, No. CV-09-265-PHX-GMS, 2009 WL 457234 (D.Ariz. 2009).

*Plaintiffs' Second Joint Objection and Motion to Strike and Motion to Reconsider Sur-Reply*

Plaintiffs assert the Court did not give Plaintiffs an opportunity to argue the original Joint Objection and Motion to Strike and Motion to Reconsider Sur-Reply during oral argument.  However, the Court informed Weik, who was presenting argument for Plaintiffs that she would ask him some questions and then allow him to make any additional comments.  After the defense made rebuttal argument, the Court permitted Weik to make additional comments.  That the Court did not specifically invite comments regarding the Plaintiffs' Joint Objection and Motion to Strike and Motion to Reconsider Sur-Reply did not prevent Plaintiffs from raising issues they thought appropriate.

---

[12]Indeed, Plaintiffs' Amended Response cites to the City Code.

1     Additionally, Plaintiffs have submitted a portion of the former City Code that differs

2 from Defendants' Exhibit A in that the City Code appears to have been modified on

3 November 21, 2006, to specify when the City Council meetings would be held. For purposes

4 of this Order, the Court will accept that City Code § 1-6-10, which addresses when City

5 Council meetings are to be held, was not in effect until November 21, 2006.

6     Lastly, the Court notes that the Plaintiffs' Joint Objection and Motion to Strike and

7 Motion to Reconsider Sur-Reply did not include "'Oral Argument Requested' immediately

8 below the title of such motion[.]" L.R.Civ. 7.2(f). Not only does a party waive any right to

9 oral argument by failing to request it, *see Dredge Corp. v. Penny*, 338 F.2d 456, 461-62 (9th

10 Cir. 1964), but the decision whether to grant oral argument is discretionary. *Biotics Research

11 Corp. v. Heckler*, 710 F.2d 1375, 1379 (9th Cir. 1983).[13] Although this Court initially

12 scheduled oral argument on this motion because of its interrelationship with the Motion for

13 Summary Judgment, the Court does not find that scheduling this matter for further oral

14 argument would assist the Court. The Court will deny the motion.

15

16 *Plaintiffs' Controverting Statement of Facts*

17     A motion for summary judgment is to set forth the specific facts (with reference to a

18 specific admissible portion of the record where the fact may be found) on which a party relies

19 separately from the memorandum of law. L.R.Civ. 56.1. Furthermore, the specific facts are

20 to be set forth in serial fashion and not in narrative form. *Id.*

21     The Court has reviewed Plaintiffs' Controverting Statement of Facts and has sought

22 to identify material factual disputes in the Court's factual summary. The Court will not

23 specifically address each dispute, but will only consider admissible evidence that is supported

24 by specific facts that may show a genuine issue of material fact. *See Anderson v. Liberty

25 Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).

26

27

28     [13]*Dredge Corp.* and *Biotics Research Corp.* discuss the requirement of oral argument as to a motion for summary judgment.

1    *Summary Judgment Legal Standard*

2        Summary judgment may be granted if the movant shows "there is no genuine issue

3    as to any material fact and that the moving party is entitled to judgment as a matter of law."

4    Rule 56(c), Federal Rules of Civil Procedure.  The moving party has the initial responsibility

5    of informing the court of the basis for its motion, and identifying those portions of "the

6    pleadings, depositions, answers to interrogatories, and admissions on file, together with the

7    affidavits, if any," which it believes demonstrate the absence of a genuine issue of material

8    fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

9        Once the moving party has met the initial burden, the opposing party must "go beyond

10   the pleadings" and "set forth specific facts showing that there is a genuine [material] issue

11   for trial." *Id.*, 477 U.S. at 248, 106 S.Ct. at 2510, internal quotes omitted.  The nonmoving

12   party must demonstrate a dispute "over facts that might affect the outcome of the suit under

13   the governing law" to preclude entry of summary judgment. *Anderson v. Liberty Lobby Inc.*,

14   477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  Further, the disputed facts

15   must be material. *Celotex Corp.*, 477 U.S. at 322-23.   In opposing summary judgment, a

16   plaintiff is not entitled to rely on the allegations of his complaint, Fed.R.Civ.P. 56(e), or upon

17   conclusory allegations in affidavits.  *Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th

18   Cir. 1992).  Further, "a party cannot manufacture a genuine issue of material fact merely by

19   making assertions in its legal memoranda." *S.A. Empresa de Viacao Aerea Rio Grandense

20   (Varig Airlines) v. Walter Kiddle & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

21       The dispute over material facts must be genuine.  *Anderson*, 477 U.S. at 248, 106

22   S.Ct. at 2510.  A dispute about a material fact is genuine if "the evidence is such that a

23   reasonable jury could return a verdict for the nonmoving party." *Id.*  A party opposing a

24   properly supported summary judgment motion must set forth specific facts demonstrating a

25   genuine issue for trial.  *Id.*  Mere allegation and speculation are not sufficient to create a

26   factual dispute for purposes of summary judgment. *Witherow v. Paff*, 52 F.3d 264, 266 (9th

27   Cir. 1995) (per curiam).  "If the evidence is merely colorable or is not significantly probative,

28   summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. at 2511.

1    However, the evidence of the nonmoving party is to be believed and all justifiable inferences
2    are to be drawn in his favor.  *Id.* at 255.  Further, in seeking to establish the existence of a
3    factual dispute, the non-moving party need not establish a material issue of fact conclusively
4    in his favor; it is sufficient that "the claimed factual dispute be shown to require a jury or
5    judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv.*, 809
6    F.2d 626, 631 (9th Cir. 1987).

7         Additionally, the Court is only to consider admissible evidence.  *Moran v. Selig*, 447
8    F.3d 748, 759-60 (9th Cir. 2006) (pleading and opposition must be verified to constitute
9    opposing affidavits); *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 484 (9th Cir. 1991)
10   (declarations and other evidence that would not be admissible may be stricken).

12   *First Amendment Retaliation Claim Against Smith*[14]

13        In a non-employment context, a First Amendment retaliation claim requires that a
14   plaintiff has engaged in constitutionally protected activity, a defendant's conduct caused the
15   plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing
16   to engage in that activity, and defendant's conduct must have been substantially motivated
17   against the plaintiff's exercise of constitutionally protected conduct.  *See e.g. Worrell v.*
18   *Henry*, 219 F.3d 1197, 1212-13 (10th Cir. 2000).

19        Defendants asserts that Plaintiffs have not identified any constitutionally protected
20   activity that Plaintiffs were engaged in.[15]  Plaintiffs assert that the constitutionally protected

22        [14]To the extent that Defendants argue that, while the City Code specifically gives
23   authority to the Marshal to enforce the animal use permit, inspect the horses, investigate
     complaints, etc., it is the City Council that has authority to issue permits and licenses, *see*
24   *Minnesota Brd. For Community Colleges v. Knight*, 465 U.S. 271, 285, 104 S. Ct. 1058,
25   1067 (1984) (the denial of permits and licenses is insufficient to state a retaliation claim), that
     argument does not address whether Smith's investigation of Weik caused Plaintiffs to suffer
26   an injury that would chill a person of ordinary firmness from continuing to engage in that
     activity.

27        [15]Defendants acknowledge that Weik asserts the retaliation was based on his
28   complaint of the May 24, 2006, incident.  However, Plaintiffs argue that the retaliation is for

1    activity at issue in this case is that Plaintiffs were petitioning the government (i.e., seeking

2    a permit) and Weik was contemplating running for city council.  While the First Amendment

3    "does not guarantee a favorable response, or indeed any response, from [government]

4    officials," *Baltoski v. Pretorius*, 291 F.Supp.2d 807, 811 (N.D.Ind. 2003), the right to redress

5    is constitutionally protected activity.

6         Defendants also assert that Plaintiffs have not shown that any injury suffered by Weik

7    would chill a person of ordinary firmness from continuing to engage in that activity and has

8    not identified any way in which Smith allegedly retaliated against Weik because of his

9    speech or activity.  *Hartman v. Moore*, 547 U.S. 250, 265-66, 126 S.Ct. 1695, 1703-04

10   (2006) (discussing "but for" causation standard in retaliation claims); *Beck v. City of Upland*,

11   527 F.3d 853, 864 (9th Cir. 2008).

12        To any extent that the claimed retaliation is for reporting Smith for the May 24,

13   2006,incident, the Court notes that Defendants assert that Smith began investigating Weik

14   based on Norby's allegations of fraud and the Fike incident before the May 24, 2006,

15   incident.[16]  Further, Defendants assert that the Fike incident was referred to the prosecutor

16   before Weik had made any complaint about the incident.  Defendants argue that Smith's

17   action in investigating Weik could not have been in retaliation when the investigation

18   occurred before Weik made a complaint.  Plaintiffs, however, assert that Weik immediately

19   reported the incident.  Whether Weik immediately reported the incident or not is not a

20   material dispute.  Smith began investigating after the May 16, 2006, information from

21   Kitchel and the May 19, 2006, information from Fike.

22        Defendants also argue that the probable cause that came from Norby and Fike defeats

23

24   _____

     petitioning the City Council and considering running for a City Council seat.

25

26   [16]Although Plaintiffs assert that Norby never indicated that she was afraid of Weik,
     this dispute is not material because evidence in the record establishes that Smith had

27   information from Kitchel of possible fraud.  Even if Kitchel's information was false, there
     is no evidence in the record to establish that Smith should have known of the falsity.  Smith

28   was entitled to rely on the information from Kitchel in pursuing the investigation.

if not totally bars any retaliation claim. *Hartman*, 547 U.S. at 265-66, *Beck*, 527 F.3d at 864. While the Ninth Circuit has interpreted *Hartman* as applicable in only those retaliation cases where a criminal prosecution results, *see Skoog v. County of Clakamas*, 469 F.3d 1221, 1234-35 (9th Cir.2006) (holding no requirement to plead and prove absence of probable cause in an "ordinary retaliation claim" and explaining that proof of an absence of probable cause is necessary in retaliatory prosecution cases due to the complexity of causation in such cases), in this case, the prosecutor in this case did initiate charges. Although the charges were ultimately dismissed, for purposes of consideration whether summary judgment is appropriate, the Court finds the initiation of those charges requires summary judgment unless the evidence establishes a lack of probable cause. Plaintiffs have not shown a lack of probable cause and, therefore, summary judgment in favor of Defendants is appropriate.

Further, Plaintiffs have failed to link Smith's investigation to any speech or activity of Plaintiffs other than the Norby and Fike incidents. For example, no evidence has been presented that Smith knew Weik was running for office. Further, the initial approval of the animal use permits had occurred months earlier. The Court finds that there is no genuine issue of material fact that Smith was substantially motivated against Plaintiffs' exercise of constitutionally protected conduct.

*First Amendment Expressive Association Claim Against Korbeck-Reeder and Schmidt*

A plaintiff alleging a violation of the right to expressive association may support his or her claim by demonstrating, *inter alia*, some form of government action to impose penalties for the expression of political views. *Roberts v. United States Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (infringement may be "justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms").

In determining whether a group is protected by the First Amendments' expressive associational right, the Court must determine if the group engages in "expressive association"

otherwise protected by the First Amendment.  *Boy Scouts of America v. Dale*, 530 U.S. 640, 648, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000).  Plaintiffs have presented evidence that Weik intended to run for the City Council and associated with then-mayor Andre DeJournett and Dwayne Harris.  While the right to associate for the advancement of common political goals is protected by the First Amendment and Fourteenth Amendments, *Timmon v. Twin Cities Area New Party*, 520 U.S. 351, 357, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997), there is no evidence in the record to support Plaintiffs' assertion that Defendants knew Weik was considering running for a position on the City Council.

Moreover, in addressing this claim, Plaintiffs assert that Schmidt, Korbeck-Reeder and Smith were angered by Notices of Claim made by Plaintiffs – Plaintiffs assert that Defendants retaliated against them by refusing to renew the permits.  However, because the denial of the requested permits and licenses is insufficient to state a claim, *see Minnesota Brd. for Community Colleges v. Knight*, 465 U.S. 271, 285, 104 S.Ct. 1058, 1067, 79 L.Ed.2d 299 (1984) (noting that "[n]othing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate and petition require government policymakers to listen or respond to individuals' communications on public issues"), the Court previously determined that Plaintiffs had failed to state a First Amendment retaliation claim against Schmidt and Korbeck-Reeder.

Additionally, the City Code, as to the Animal Use Permit requirements, does not "aim at the suppression of speech, does not distinguish between prohibited and permitted activity on the basis of viewpoint, and does not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623, 104 S.Ct. 3244, 3253, 82 L.Ed.2d (1984)  [Citations omitted.]  Further, the City Code does not grant the City Council "unfettered discretion" in determining whether a permit should be granted.  *See Seattle Affiliate of the October 22nd Coalition v. City of Seattle*, 550 F.3d 788, 794 (9th Cir. 2008).  Rather, the City Code sets forth the requirements and sets forth the considerations to be made in determining whether a permit should be granted.  The City Code is content neutral.

The Ninth Circuit has stated:

> Outside the school speech context, the Supreme Court has repeatedly held that a law restricting speech on a viewpoint- and content-neutral basis is constitutional as long as it withstands intermediate scrutiny – i.e., if: (1) "it furthers an important or substantial government interest"; (2) "the governmental interest is unrelated to the suppression of free expression"; and (3) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." [*Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 661-62, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).] The same is true of a regulation that has an incidental effect on expressive conduct. *United States v. O'Brien*, 391 U.S. 367, 376-77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

*Jacobs v. Clark County School Dist.*, 526 F.3d 419  434 (9th Cir. 2008), *footnote omitted*. To the extent that Plaintiffs are arguing that the City Code, as applied, has an incidental effect on their expressive conduct, the consideration of safety concerns (including the staging of the horses), a driver's license requirement, and an insurance requirement further a substantial government interest in the safety of persons. Indeed, even the driver's license requirement is "to ensure competency levels and knowledge of applicable transportation codes of the state of Arizona[.]" City Code 8-5-2(I)(1). This governmental interest is unrelated to the suppression of free expression and is no greater than is needed to further the governmental interest. There is no genuine issue of material fact presented to the Court that the lack of renewal of the permit, with an invitation to Plaintiffs to return with additional information, unjustifiably infringed on Plaintiffs' First Amendment expressive association rights. Summary judgment in favor of Defendants is appropriate.

*Fourth Amendment Claim Against Smith – May 19, 2006*

Defendants assert that, in taking and then returning the waivers, Smith did not violate the Fourth Amendment. Defendants assert that Smith had the authority under the City Code to investigate the Fike incident and took the waivers without objection. Plaintiffs argue that Smith was not a certified police officer, was impersonating a police officer, and committed larceny by taking the waivers from the store.[17] However, Plaintiffs do not dispute that Smith

---

[17]The Court notes that Plaintiffs have not pointed to any authority that Smith did not have the authority to act as a peace officer; i.e., any authority that states that Smith was

1    was hired as, and acting as, the Tombstone Marshal.  *See* Tombstone Code § 1-14-2.  As

2    such, Smith was acting under color of law, i.e., under pretense of law, which occurs when

3    an officer's action are in some way related to the performance of his official duties.  *Huffman*

4    *v. County of Los Angeles*, 147 F.3d 1054, 1058 (9th Cir.1998), *quotation marks and citations*

5    *omitted*; *see also Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031, 89 L.Ed. 1495

6    (1945) ("It is clear that under 'color' of law means under 'pretense' of law.").

7            To the extent that Defendants argue that Smith took the waivers without objection,

8    Smith  testified during his deposition:

9        A:      . . . The waivers that I saw in the store I took, made copies of them, returned
                 them and then submitted the waivers I had with my report to the prosecutor.
10
         Q:      How did you get those waivers?
11
         A:      I took them.
12
         Q:      You took them?
13
         A:      Uh-huh.
14
         Q:      Without permission?
15
         A:      I didn't ask permission.
16
         Q:      Did you ask David for those waivers?
17

18   _____

19   required to be certified under the Arizona Peace Officer Standards and Training Board ("AZ
     POST") – rather, the documentation provided by Plaintiffs indicates that a grace period for
20   compliance is provided for and a waiver of academy attendance can be requested.  Although
     Plaintiffs point to A.R.S. § 41-1822 for the assertion that the AZ POST is authorized to
21   establish minimum qualifications, this provision does not address deficiencies, grace periods,
     academy waiver, or the authority of a person appointed by the governing authority (i.e., the
22   City Council) in such a situation.  It is not disputed that the City Council appointed Smith as
     the Tombstone Marshal.  Further, the documentation establishes that Smith was taking steps
23   to be AZ POST certified.  Although Plaintiffs have also provided documentation that Smith
     was advised by the AZ POST that he did not have peace officer authority, they have not
24   provided any basis to conclude that Smith could not perform some functions in his appointed
     position.  *See* Tombstone Code § 1-14-4.  Additionally, Plaintiffs have provided a letter from
25   Curt Milam with AZ POST indicating that Smith was not a Certified Arizona Peace Officer.
     Milam also indicates that he told Smith he could not present himself with a badge and a gun.
26   PSSOF, Ex. 87.  During his deposition, Smith acknowledged that he was not AZ POST
27   certified between March 2006 and November 15, 2006.
28

A:     No, I took the waivers.  I said, "I'm taking these for evidence and I'm going to make copies and bring them back".

Q:     Didn't David refuse you those waivers?

A:     I got the waivers, so obviously he did not refuse –

Q:     I'm going to object, non-responsive.  Did you ask David for the waivers?

A:     No, I took the waivers.

PSSOF, Ex. 76, p. 236-37.

In the Fourth Amendment context, the Ninth Circuit has stated that consent may not be shown by a failure to object.  *See Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1017 (9th Cir. 2008), *quoting United States v. Shaibu*, 920 F.2d 1423, 1427 (9th Cir.1990).  Although consent to a warrantless search or seizure can be inferred from nonverbal actions, it "must be 'unequivocal and specific' and 'freely and intelligently given.'" *United States v. Basher*, 629 F.3d 1161, 1167 (9th Cir. 2011), *quoting United States v. Chan-Jimenez*, 125 F.3d 1324, 1328 (9th Cir.1997).  The dispute about whether consent was given for the seizure constitutes a dispute of material fact.  *See e.g. Marks v. Clarke*, 102 F.3d 1012, 1032 (9th Cir. 1996). "Because the conduct alleged by plaintiffs would be clearly unlawful and because a material dispute of fact exists, [. . . Smith] is not entitled to summary judgment on the basis of qualified immunity[.]"  *Id*.[18]

Additionally, the Ninth Circuit has stated that, while "some governmental intrusions may be so minor as not to violate the Fourth Amendment at all, . . . it has never held that actions that do violate the Fourth Amendment may result in such little harm that § 1983 is not an available remedy." *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 949 (9th Cir.

---

[18]Government officials are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Liston v. County of Riverside*, 120 F.3d 965, 975 (9th Cir. 1997), citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).  Any genuine issues of material fact concerning the underlying facts of what the officer knew or what the officer did are questions of fact for the jury. *Acosta v. City and County of San Francisco*, 83 F.3d 1143, 1149 (9th Cir. 1996), *citing Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1099 (9th Cir. 1995).

1    2003), *overruled on other grounds.*[19]  This Fourth Amendment claim on behalf of Plaintiffs

2    against Smith may proceed.

3

4    *Fourth Amendment Claim Against Smith – May 24, 2006*

5           Defendants also assert the May 24, 2006, incident does not constitute a Fourth

6    Amendment violation.  *See, e.g., Brower v. County of Inyo,* 489 U.S. 593 (1989).  The

7    Supreme Court has stated that "[a] 'seizure' triggering the Fourth Amendment's protections

8    occurs only when government actors have, by means of physical force or show of authority,

9    in some way restrained the liberty of a citizen." *Graham v. Connor*, 490 U.S. 386, 395 n. 10,

10   109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), *alterations and quotations omitted*.  A seizure takes

11   place when, "taking into account all of the circumstances surrounding the encounter, the

12   police conduct would 'have communicated to a reasonable person that he was not at liberty

13   to ignore the police presence and go about his business.'" *Kaupp v. Texas*, 538 U.S. 626,

14   629, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003), *quotation omitted*.

15          The parties dispute what occurred during this incident.  Accepting all reasonable

16   inferences in favor of Plaintiffs, the non-moving parties, Smith restrained the liberty of Weik

17   by pushing him against a rail and trying to remove his gun.  Indeed, the Ninth Circuit has

18   stated that "[g]ratuitous and completely unnecessary acts of violence by the police during a

19   seizure violate the Fourth Amendment." *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir.

20   2001), *citing McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir.1988).  "Because the

21   ────────────────────

22          [19]In the context of suppression of evidence during a criminal proceeding, the Ninth

23   Circuit considered whether the defendant had been inconvenienced or whether his plans had
     been interfered with.  *United States v. Beale*, 736 F.2d 1289 (9th Cir. 1984).  During his

24   deposition, Weik testified that Smith contacted him around 11:00 or 11:30 and that they met
     at the store to talk about the Fike incident.  PSSOF, p, 149.  Weik further testified that his

25   attorney had arranged for Weik to retrieve the waivers from the Marshal's office at 3:00.
     PSSOF, p. 154.  In other words, Smith interfered with Plaintiffs' Fourth Amendment rights,

26   by the seizure of the waivers, for no more than four hours.  However, Weik was
     inconvenienced in that he personally and through his attorney had to take actions to retrieve

27   the waivers.  Moreover, accepting all reasonable inferences in favor of Plaintiffs, the non-

28   moving parties, Smith acted after being denied permission to take the waivers.

1    conduct alleged by plaintiffs would be clearly unlawful and because a material dispute of fact

2    exists, [. . . Smith] is not entitled to summary judgment on the basis of qualified immunity[.]"

3    *Marks*, 102 F.3d 1012 at 1032.  This Fourth Amendment claim on behalf of Weik against

4    Smith may proceed.

5

6    *Fifth Amendment Takings Claim Against Korbeck-Reeder and Schmidt*

7         A Fifth Amendment regulatory takings claim is considered non-categorical when the

8    alleged taking "is the consequence of a regulatory imposition that prohibits or restricts only

9    some of the uses that would otherwise be available to the property owner, but leaves the

10   owner with substantial viable economic use."  *Rith Energy, Inc. v. United States*, 247 F.3d

11   155, 1362 (Fed.Cir. 2011), *citation omitted*.  The determination of whether an actionable

12   non-categorical taking has occurred requires a fact-based inquiry into (1) the character of the

13   governmental action; (2) the economic impact of the action on the plaintiff; and (3) the

14   effects of the governmental action on the reasonable investment-backed expectations of the

15   plaintiff.  *See, Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537, 125 S.Ct. 2074, 2081, 161

16   L.Ed.2d 876 (2005); *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct.

17   2646, 2659, 57 L.Ed.2d 631 (1978); *American Pelagic Fishing Co., LP v. United States*, 379

18   F.3d 1363, 1372 (Fed.Cir.2004).

19        As argued by Defendants, Plaintiffs have not shown that they were entitled to or had

20   a protectable property interest in the permits.  *See, e.g., United States v. Fuller*, 409 U.S. 488,

21   494, 93 S. Ct. 801 (1973) (property right must have indicia of rights such as transferability

22   and excludability).  The requested permits were within the discretion of the City Council,

23   were limited in duration, were not transferrable, and did not permit Plaintiffs to exclude

24   anyone.

25        Moreover, where a government decision diminishes the value of private property, the

26   act does not constitute a taking requiring compensation if, despite the regulation, a reasonable

27   use of the regulated property still exists.  *See Silveira v. Lockyer*, 312 F.3d 1052, 1092 (9th

28   Cir.2002).  Indeed, "[a] requirement that a person obtain a permit before engaging in a

certain use of his or her property does not itself 'take' the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985). It is only when the effect of a permit denial is to prevent "economically viable" use of the property in question can it be said that a taking has occurred. *Id*. While the "economic impact of the action on [Plaintiffs' interest in the horses and the rental interest in the stable] is presumably substantial," it potentially could have been "temporary" if Plaintiffs had sought to address the concerns of the City Council. *Carr HUML Investors, LLC v. Arizona*, CV 05-2233 PHX MEA, CV 05-2470 PHX MEA, CV 06-2636 PHX MEA, 2007 WL 4403981 *17 (D.Ariz. 2007).

Defendants point out that the original permits were to stage the horses on 4th Street and Plaintiffs were not complying with those permits. Indeed, Plaintiffs do not dispute that the City Council was informed that the staging area issue was unresolved. In other words, the requested permits did not resolve the staging area issue and it appears that Plaintiffs were seeking to obtain permits for which Plaintiffs did not intend to comply. The governmental action in not voting on the requested permits (which, as a practical matter, constitutes a denial of the permits) was within the City Council's discretion to issue permits, limit permits, and place restrictions on permits. *See Erdelyi v. O'Brien*, 680 F.2d 61, 63 (9th Cir. 1982), *citation omitted* ("Whether the statute creates a property interest in concealed weapons licenses depends 'largely upon the extent to which the statute contains mandatory language that restricts the discretion of the (issuing authority) to deny licenses to applicants who claim to meet the minimum eligibility requirements.'"). Not only did Plaintiffs still have an economically viable use of the property, but Plaintiffs have not shown that they could not have addressed the concerns of the City Council and again request a permit. Summary judgment in favor of Defendants is appropriate.

The Court also agrees with Defendants that they are entitled to qualified immunity on this claim. Taken in a light most favorable to Plaintiffs, the facts do not show that

Defendants' conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001); *see also Billington v. Smith*, 292 F.3d 1177, 1183 (9th Cir. 2002).   Moreover, the defense of qualified immunity allows for errors in judgment and protects "all but the plainly incompetent or those who knowingly violate the law . . . [I]f officers of reasonable competence could disagree on the issue [whether or not a specific action was constitutional], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).   Qualified immunity balances the interests of "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009); *Watkins v. City of Oakland*, 145 F.3d 1087, 1092 (9th Cir. 1998).   In this case, the staging area issue was not resolved, the City Council was aware of safety concerns, the City Code granted the City Council discretion in granting permits, and the City Council's action did not prohibit Plaintiffs from returning to seek a permit.   The Court finds that city councilpersons of reasonable competence could disagree on whether the conduct was constitutional.   Defendants are entitled to qualified immunity on this claim and, therefore, summary judgment in favor of Defendant is appropriate.

*Fourteenth Amendment Due Process Claim against the City of Tombstone, Korbeck-Reeder, and Schmidt*

Fourteenth Amendment substantive due process rights are those not otherwise constitutionally protected but which are deeply rooted in this country's history and tradition and "implicit in the concept of ordered liberty" such that "neither liberty or justice would exist if it were sacrificed. *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997).   Plaintiffs have asserted that Defendants have violated Plaintiffs' substantive due process rights by deliberately abusing their power without any reasonable justification in aid of any government interest or objective and only to oppress in a way that shocks the conscience. *Sandin v. Connor*, 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132

1   L.Ed.2d 418 (1995); *Daniels v. Williams*, 474 U.S. 327 (1986); *Board of Regents of State*

2   *Colleges v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

3       "A protected property interest is present where an individual has a reasonable

4   expectation of entitlement deriving from 'existing rules or understandings that stem from an

5   independent source such as state law.'"   *Wedges/Ledges of California, Inc. v. City of*

6   *Phoenix, Arizona*, 24 F.3d 56, 62 (9th Cir. 1994), *quoting Board of Regents v. Roth*, 408 U.S.

7   564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).   "A reasonable expectation of

8   entitlement is determined largely by the language of the statute and the extent to which the

9   entitlement is couched in mandatory terms." *Association of Orange Co. Deputy Sheriffs v.*

10  *Gates*, 716 F.2d 733, 734 (9th Cir. 1983).  Where, as here, the City Council has the discretion

11  to grant or deny a permit, Defendants argue that Plaintiffs cannot show an entitlement.

12  *Lindsay v. City of Philadelphia*, 844 F.Supp. 229 (E.D. Pa. 1994).  Indeed, Defendants point

13  out that there is no basis in the City Code for this claimed entitlement especially when

14  Plaintiffs did not meet the requirements for the permit.

15       Furthermore, Defendants argue that substantive due process claims must be grounded

16  in fundamental rights. *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997).  In other words,

17  Defendants point out that, in order to qualify for "substantive due process" protection, an

18  alleged "property interest" must consist of something more than an abstract need, desire or

19  expectation of the interest.  Because of the discretionary nature of the City Council's action,

20  Defendants assert Plaintiffs cannot show a "legitimate claim of entitlement" to the property

21  interest.  *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972); *see also Lindsay v. City of*

22  *Philadelphia*, 844 F.Supp. 229 (E.D. Pa. 1994).  Further, Defendants assert Plaintiffs do not

23  have a protected interest unless and until they can demonstrate that their renewal permit fully

24  complied with the City requirements and the City Council had no discretion in denying it.

25  *See Aegis of Arizona, L.L.C. v. Town of Marana*, 206 Ariz. 557, 570, 81 P.3d 1016, 1029

26  (App. 2003) ("Courts repeatedly have held that a complaining landowner's substantive

27  process and equal protection rights are not violated even when a municipality acts in

28  violation of state or local law, in bad faith, and/or beyond its jurisdiction."); *Bartolomeo v.*

*Town of Paradise Valley*, 129 Ariz. 409, 415, 631 P.2d 564, 570 (App. 1981) (since the record involving application for special use permit showed reasonable concerns, town council's denial of permit application was not arbitrary or unreasonable).

Recently, the Ninth Circuit declined to find a legitimate entitlement where the governing body was not limited in its discretion to grant or deny a permit. *Gerhart v. Lack County, Mont.*, — F.3d — , 2011 WL 923381 (9th Cir. 2011). In this case, the City Code set forth prerequisites for a permit and provided factors to consider in determining whether a permit should be granted or denied; however, within those parameters, it was within the discretion of the City Council whether or not to renew the permit.

However, the United States Supreme Court has recognized that property interests may extend to benefits that have already been acquired. The Court has held that "once licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees." *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). "'[A] regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause.'" *Id.*, *quoting Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 542, 125 S.Ct . 2074, 161 L.Ed.2d 876 (2005).

Plaintiffs have presented evidence that the City Council did not require strict adherence to the permit prerequisites on January 5, 2006, when their permits were initially approved. Further, Plaintiffs do not dispute (although they attempt to excuse) that they had not met all of the requirements (e.g., no insurance (Plaintiffs assert they would have renewed policy if permit had been renewed); lack of Weik's license on file (Plaintiffs had provided Norby's license) for a renewal. However, new requirements, not inconsistent with the terms of an ordinance, may be required for a renewal. 62 C.J.S. Municipal Corporations § 171. Here, the City Council did not mandate new requirements, but simply enforced "old"

requirements.[20]   Moreover, Defendants have argued, and City Council meeting minutes confirm, that the City Council was concerned with safety issues.  Indeed, the Court notes that the City Council meeting minutes indicate that safety issues were an ongoing concern since the issuance of the original permits.  The Court finds that there is not a material factual issue in dispute – the City Council acted within its discretion.  Summary judgment in favor of Defendants on this claim is appropriate.

Moreover, the Court finds that city councilpersons of reasonable competence could disagree on whether the conduct was constitutional.  Defendants are entitled to qualified immunity on this claim and, therefore, summary judgment in favor of Defendants is appropriate.

*Fourteenth Amendment Equal Protection Claim Against the City of Tombstone, Korbeck-Reeder, and Schmidt*

"The Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).  "'To state a claim . . . for a violation of the Equal Protection Clause . . . a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001), *quoting Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

Moreover, "[i]n order to claim a violation of equal protection in a class of one case, the plaintiff must establish that the [defendant] intentionally, and without rational basis, treated the plaintiff differently from others similarly situated."  *N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008); *City of Cleburne v. Cleburne Living Center*, 473

---

[20] In relying on *Rivera v. City of Phoenix*, 186 Ariz. 600, 925 P.2d 741 (App. 1996), for the assertion that they have a vested property right because they have incurred expenses in reliance on the issuance of the original permit, Plaintiffs fail to acknowledge that the *Rivera* court ruling was premised on a *legitimately* issued permit – it was only because of the discretion of the City Council that certain prerequisites were not originally required.

U.S. 432, 440 (1985).  Defendants assert that a "rational-basis review in an equal protection analysis is not a license for courts to judge the wisdom, fairness or logic of a governmental activity."  *Heller v. Doe*, 509 U.S. 312, 319 (1993).  Indeed, Defendants asserts that the actions or inactions of the City Council and its members cannot be challenged, "if there is any reasonable conceivable state of facts that could provide a rational basis" for their conduct.  *Fed. Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993); *see also, Gerhart*, 2011 WL 923381 * 7 (issue is whether there is a rational basis for treating plaintiff differently, not whether there is a rational basis for denying permit).

Defendants assert that the facts present a rational basis for the City Council's conduct – the City Council had a good faith basis not to make a decision until Plaintiffs had a staging area and had complied with all permit requirements.  Moreover, the evidence presented by both Plaintiffs and Defendants establish that all parties were concerned about safety issues.[21]  Further, the Court considers that Plaintiffs have not presented any evidence that they were treated differently than any other business seeking to conduct trail rides.[22]  *See e.g., Gerhart*, 2011 WL 923381 * 7 ("[plaintiff] presented considerable evidence that he ws treated differently than other similarly situated property owners throughout the permit application process").

Further, Plaintiffs have not presented any evidence, as opposed to speculation, that the reasons offered by Defendants are pretextual.  *See Squaw Valley Development Co. v. Goldberg*, 375 F.3d 936 (9th Cir. 2004) (need to show disparate treatment, defendant's action were arbitrary or irrational and not supported by a rational basis, and proffered reason was a pretext), *overruled on other grounds*.

---

[21]The Court notes that although Plaintiffs argue that their horses did not present a safety issue, they have stated that there were safety concerns regarding the staging of the horses.

[22]Plaintiffs have presented evidence of other businesses that have been granted permits (e.g., Old Tombstone Stables) and others that have not been granted permits (e.g., Horst T.R.O.T. Stables, LLC); however, Plaintiffs have not presented any evidence that a *trail ride* business has been granted a permit and/or was subject to a different standard.

1    Moreover, the Court finds that city councilpersons of reasonable competence could

2    disagree on whether the conduct was constitutional.  Defendants are entitled to qualified

3    immunity on this claim and, therefore, summary judgment in favor of Defendants is

4    appropriate.

5

6    *42 U.S.C. § 1983 Conspiracy Claim Against Smith, Korbeck-Reeder, and Schmidt*

7    To establish a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must show "'an

8    agreement' or 'meeting of the minds' to violate constitutional rights.  The defendants must

9    have, 'by some concerted action, intend[ed] to accomplish some unlawful objective for the

10   purpose of harming another which results in damage."  *Mendocino Environmental Center v.*

11   *Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999), *citations omitted.*  Furthermore, a

12   plaintiff must establish that there was an actual deprivation of his constitutional rights as a

13   result of the conspiracy.  *Hart v. Parks*, 450 F.3d 1059, 1071 (9th Cir. 2006), *citing*

14   *Woodrum v. Woodward County, Oklahoma*, 866 F.2d 1121, 1126 (9th Cir. 1989).

15   Plaintiffs have presented evidence that Smith told Weik that failure to comply with

16   his demands would result in Plaintiffs permits being "pulled" and that Smith subsequently

17   recommended to the mayor and council that Plaintiffs be denied continuing operations within

18   the city limits.  The City Council subsequently failed to approve the permit renewal.

19   Plaintiffs argue that the dated history of the chain of events clearly establishes the meeting

20   of minds of Korbeck-Reeder, Schmidt and Smith; however, the evidence merely presents

21   speculation.  Plaintiffs have not presented any evidence of a meeting of minds to violate the

22   constitutional rights of Plaintiffs.  The Court finds there is no genuine issue of material fact

23   in dispute and summary judgment in favor of Defendants is appropriate.

24

25   *Attorney's Fees and Costs*

26   Defendants assert that this is a frivolous lawsuit, they are entitled to summary

27   judgment and are entitled to fees and costs pursuant to 42 U.S.C. § 1988; *Karam v. City of*

28   *Burbank*, 340 F.3d 884 (9th Cir. 2003).  Because issues remain pending, an award of

attorney's fees and costs is not appropriate at this time.

Accordingly, IT IS ORDERED:

1.    Defendants' Motion for Summary Judgment (Docs. 190, 196, 228) is GRANTED IN PART AND DENIED IN PART.

2.    Summary judgment in favor of Defendants and against Plaintiffs is awarded on the First Amendment, Fifth Amendment, Fourteenth Amendment, and conspiracy claims. The Fourth Amendment claims being the only remaining claims, Korbeck-Reeder and Schmidt are DISMISSED from this action.[23]

3.    Plaintiffs' Objections and Motions to Strike and Motions to Reconsider Sur-Reply.  (Docs. 252, 253, and 258) is DENIED.

4.    The parties shall submit their Proposed Joint Pretrial Order on or before May 2, 2011.  *See generally* May 23, 2008, Order.

DATED this 31st day of March, 2011.

_____
Cindy K. Jorgenson
United States District Judge

---

[23]The Court notes that Defendants did not move for summary judgment as to the City of Tombstone.  *See* December 1, 2008 Order (finding Plaintiffs had stated claims against City of Tombstone where claims were adequately stated against individual defendants).  Although Plaintiffs did not present evidence of a policy or custom of the City of Tombstone as to the Marshal's authority or the Fourth Amendment claims, because Defendants did not raise this issue in their Motion for Summary Judgment, Plaintiffs had no reason to present such evidence and summary judgment on the Fourth Amendment claims against the City of Tombstone is not appropriate.